# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEJANDRO FIERRO-TREJO,<br><br>                      Petitioner,<br>  vs.<br>ERIC H. HOLDER Jr., Attorney General,<br><br>                      Respondent. | CASE NO. 10-CV-468-LAB-JMA<br><br>**ORDER** |

Petitioner, who entered the United States as a lawful permanent resident in 1991, was convicted of marijuana and cocaine possession in 2004, and sentenced to four years in prison. The Department of Homeland Security subsequently initiated removal proceedings against him pursuant to 8 U.S.C. § 1227(a)(2)(A)(iii) and 8 U.S.C. § 1227(a)(2)(B)(i), and following a hearing on the merits, an immigration judge ordered Petitioner removed from the United States. The Board of Immigration Appeals affirmed the immigration judge's decision. Petitioner then appealed to the Ninth Circuit, which transferred the case to this Court for a hearing on the question whether Petitioner is a United States citizen and therefore not subject to removal. This Court reviews the decision of the immigration judge *de novo*. *Martinez-Madera v. Holder*, 559 F.3d 937, 940 (9th Cir. 2009).

The Court held two hearings, the first on January 3, 2011 and the second on February 17, 2011. Both hearings focused on the same question: Whether Petitioner derived citizenship at birth through his father, Jose Guadalupe-Fierro, on the ground that the father

was present in the United States for 120 months before Petitioner was born.  At the time of Petitioner's birth, derivative citizenship applied to "[a] person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than ten years, at least five of which were after attaining the age of fourteen years." 8 U.S.C. § 1401(g) (1982).

Petitioner's initial position, based on the present testimony of his father, was that his father was in the United States *continuously* from October 18, 1968 through November 1977, and intermittently from November 1977 until Petitioner's birth on September 7, 1982, for a total of 156 months.  (Doc. No. 8-1 at 8.)  The Court reasonably discredited this account.  During the Petitioner's removal proceedings before the immigration judge on February 5, 2009, Petitioner's father testified that he first came to the United States as a seasonal worker, not that he stayed in the country continuously from October 1968 through November 1977:

> Q: When you came to work here in 1968, how long did you stay?
>
> A: Me?
>
> Q: Yes.
>
> A: I worked seven, eight, nine months.
>
> Q: Then what?
>
> A: I went to Mexico and I stayed three to four months and then came back here.
>
> Q: And during the time that you were here for the seven, eight, nine months, did you also make occasional visits to Mexico to visit your family?
>
> A: Yes.

(Doc. No. 9 at 9.)  Petitioner's father also indicated in a Green Card application that he filed on July 28, 1977 that he left the United States in 1971, which is obviously at odds with the account that he stayed in the country from the date of his arrival until November 1977.  (Doc.

No. 9 at 14.)  Petitioner attempted to explain away these inconsistencies by arguing, in essence, that his father was confused (and ill-advised) during his removal hearing, and that he did not fill out the Green Card application himself.

At the January 3, 2011 hearing, Petitioner's father stuck to the story that he came to the United States in 1968 and didn't leave until 1977, doing farm and harvesting work in the warmer months and artificially inseminating turkeys in the winter:

> Q:   When was the first time you went to Mexico after arriving in the United States in October 1968?
>
> A:   The first time I went to Mexico was in November of 1977.
>
> Q:   Why did you not go to Mexico before that time?
>
> A:   Because I liked it here and because there was a lot of work here and because there is — this is a country where there a [sic] lot of room for growth.

(Jan. Hrg. Tr. at 15:16–22.)  He reiterated this position throughout his testimony. (*See, e.g.*, Jan. Hrg. Tr. at 41:16–18 ("In November of '77 was the first time when I went back to Mexico since I'd been in the U.S. since '68.").)  If it's true that Petitioner's father was in the United States continuously from October 1968 until November 1977, then there's no doubt that he was here for 120 months before Petitioner was born.  That time period alone accounts for 108 months, and Petitioner's father clearly amassed another 12 months between November 1977 and Petitioner's birth in September 1982 when he admits he was back and forth between the United States and Mexico.

But for reasons the Court gave at the conclusion of the first hearing, it does not credit the account that Petitioner's father stayed in the United States for 108 months after he entered for the first time.  For example, the Green Card application Petitioner's father claims someone else filled out for him — and that contradicts his present testimony in critical respects — contains specific, verified information that is actually suggestive of the father's input, namely that he left the United States to attend a funeral in Mexico in 1995.  If someone else executed the Green Card application for Petitioner's father and got this right, one has to assume the other information provided on the application is also right.  (*See* Jan. Hrg. Tr. at 53:15–54:16.)  Additionally, the Court fails to understand what was confusing about the

question "When you came to work here in 1968, how long did you stay?" Petitioner's father was asked this question at the Petitioner's removal hearing, and his answer "I worked seven, eight, nine months" is perfectly consistent with the yearly calendar of a farm worker from Mexico. In the Court's view, this makes Petitioner's father's present, reformed testimony suspect considering that he now clearly understands what's at stake.

Unpersuaded by Petitioner's initial attempt to establish his derivative citizenship, the Court offered him the opportunity to present additional evidence at a second hearing. This could be evidence that his father actually stayed in the United States year-round during some of the years between October 1968 and November 1977, or evidence that, during those years, he was in the United States for nine months a year as opposed to seven. Indeed, it is not essential to Petitioner's case that his father was in the United States continuously for many years before he returned to Mexico for the first time. If he was here for only 9 months a year from his arrival in the United States until his son's birth, he was in the United States for 120 months before his son was born. The Court also indicated, however, that it was inclined to adopt the 8-month figure, which put the onus on Petitioner to show that his father spent at least two full years in the United States between October 1968 and November 1977:

> I think it's fair to use the eight-month figure because I credit the testimony that gave a range. I don't say, "Well, I doubt that." I think he was accurate when he said, "I stayed seven or eight or nine months." So we don't know for sure. It's fair, given that I credit the range, to take the middle of the range. I think that's fair.

(Jan. Hrg. Tr. at 80:5–10.) Crediting Petitioner's father with spending 8 months a year in the United States before Petitioner was born, Petitioner is just five months shy of establishing derivative citizenship.[1] Thus, merely showing that is father spent *two* continuous years in

---

[1] There are two ways to run the numbers here. One is to assume Petitioner's father did not leave the United States in 1968, the year that he arrived, or in 1982, the year of his son's birth, and that he spent 11 months in the United States in those years. Then, these 11 months are added to the time Petitioner's father was in the United States in the intervening 13 years — assuming either 7, 8, or 9 months a year. This is the method the Petitioner urges, and it is also the method the immigration judge followed at Petitioner's removal hearing. (*See* Doc. No. 9-1, Ex. 6 at 6 ("If the Respondent's father was present in the United States for seven months between 1969 and until the Respondent's birth in

- 4 -

the United States would suffice. (*See* Feb. Hrg. Tr. at 6:21–7:4.)

To make this case, Petitioner called two witnesses at the second hearing. The first — and the only witness whose testimony the Court credits[2] — was Josephine Ruiz, who testified that she lived with Petitioner's father in Modesto, California from late 1973 or early 1974 until late 1977, and that he never returned to Mexico during that time:

> Q: When did you move in together?
>
> A: About late '73 or early '74.
>
> Q: What was the address of the place that you moved in together?
>
> A: 1609 F Street, Modesto, California.
>
> Q: How long did you and Jose Fierro live at 1609 F Street?
>
> A: Three or four years . . . .
>
> Q: Did Jose ever go away for longer periods of time?
>
> A: No . . . .
>
> Q: So you started living with Jose in late 1973 or early 1974. Did Jose ever go back to Mexico during that time?
>
> A: No.

---

September of '82, it comes out to be less than 120 months. It would come out to be a total of 93 months if I include all of 1982 up until the Respondent's birth date and all of October and the months remaining in 1968 when the father arrived.").) The other method, which the Government urges, applies a 7, 8, or 9 month multiplier to 14 years, and then deducts a year because Petitioner's father arrived in the United States in October and his son was born in September.

Under either method, if Petitioner's father was in the United States for 9 months a year, Petitioner prevails; it comes out to 125 months under the Government's method and 128 under the Petitioner's. If Petitioner's father was here for 7 or 8 months a year, and never all year, Petitioner does not prevail, although the number of months he is short depends on which method is used. At seven months a year, the Government's method would credit Petitioner's father with 97 months, and Petitioner's method would credit his father with 102 months. At eight months a year, those numbers would be 111 and 115, respectively. The Court's inclination is to accept Petitioner's method, considering the immigration judge followed it, and also considering, as we shall see, that the decision is not outcome-determinative.

[2] Petitioner's other witness had suffered a head injury and his recollections were clearly very confused. Although he didn't appear to be either biased or willfully untruthful, no part of his testimony was reliable. For example, while Petitioner's father maintained he first came to the United States in October 1968, this witness maintained they lived together in Modesto in 1962 and 1963. (Feb. Hrg. Tr. at 40:7–12.)

- 5 -

| | | |
|---|---|---|
| Q: | Did he ever go back to Mexico during the Winter of 1974, 1975? |
| A: | No. |
| Q: | Did Jose Fierro ever go back to Mexico during the winter of '75, '76? |
| A: | No . . . . |
| Q: | During the time that you moved in together in late '73 or early '74 until the time that Jose moved out in '77, did he ever go to Mexico? |
| A: | No. |

(Feb. Hrg. Tr. at 9:2–10:17.) If Ms. Ruiz's testimony is credited, the Court doesn't need to determine *exactly* how long Petitioner's father was in the United State before Petitioner was born in order to conclude he was here for 120 months. There were at least two years between October 1968 and November 1977 when Petitioner's father did not return to Mexico.

While the Court found Ms. Ruiz to be a credible witness, her testimony was not without holes. For example, in an interview with lawyers for the Government, Ms. Ruiz indicated that she married Louie Martinez in 1969 or 1970, and lived with him for one year and by herself for two years, before moving in with Petitioner's father. That was consistent with her testimony at the hearing that she moved in with Petitioner's father in late 1973 or early 1974.[3] But the Government presented Ms. Ruiz with a marriage certificate indicating that she and Mr. Martinez were married in September of 1972, which means, if she lived with Mr. Martinez for one year and by herself for two, she could not have moved in with Petitioner's father until September of 1975. (*See* Feb. Hrg. Tr. at 12:17–17:22.) Ms. Ruiz also testified that she was living in Modesto with Petitioner's father until he left in 1977, but she was arrested for drunk driving on October 20, 1976 and the car she was in was

---

[3] In his answer to the Government's interrogatories, Petitioner's father represented that he lived in Modesto with Ms. Ruiz from January 1974 until October 1977. (Doc. No. 9-1, Ex. 18 at ¶ 8(c).)

- 6 -

registered to Petitioner's father at 108 Sycamore Avenue in Manteca, California.[4] (Feb. Hrg. Tr. at 19:7–21:6.) And while it's Petitioner's position that his father left the United States in November 1977, Ms. Ruiz testified that Petitioner's father was with her, in the United States, at that time. (Feb. Hrg. Tr. at 27:5–21.)

Ms. Ruiz's testimony at the February hearing wasn't unimpeachable, obviously, but the Court did find her to be credible on *the* critical point here, which is that Petitioner's father was in the United States continuously for at least two of the years between his arrival on October 18, 1968 and his return to Mexico in November 1977. The Court acknowledges Petitioner has failed to pin down the *exact* years, but it's not exactly a realistic expectation that he do so given the passage of time and the fading of memories. Nor does the law require that degree of specificity; Petitioner need only show his father was in the United States for 120 months before his birth, not where he lived and what he was doing and exactly how many months, beyond 120, he was here.

The Court therefore concludes: It is appropriate to credit Petitioner's father with 11 months in the United States in 1968 and 1977, and 8 months for each of the intervening years.[5] That accounts for 115 months. The Court is also sufficiently confident, based on Ms. Ruiz's testimony, that Petitioner's father, for at least two of those intervening years, lived

---

[4] Petitioner's father concedes he lived at the Sycamore address in Manteca when he arrived in the United States in October 1968, but maintains he was only there for a day. (Doc. No. 9-1, Ex. 18 at ¶ 1.)

[5] The Court reiterated during the February hearing why it would credit Petitioner's father with 8 months a year:

> My narrow question to you is it would be [sic] a fair and permissible reading of the immigration record for me to say, well, he also said he was out three to four months. If I take the three to four months a year and try to reconcile it with the seven-to-nine-month estimate that he was here, we arrive at eight months.
> He didn't say five months, so I wouldn't go to seven necessarily. The place where they intersect is about the eight-month point. That's why crediting that testimony, I think it's fair to give him credit for eight months out of the year between '68 . . . and moving forward to November of '77.

(Feb. Hrg. Tr. at 65:15–25.)

1 | in the United States full-time, which amounts to an additional 8 months.  The Government
2 | concedes that Petitioner need only show *by a preponderance of the evidence* that his father
3 | was in the United States for 120 months before his birth, and based on witness testimony
4 | presented, the Court finds he has made that showing. *Alcarez-Garcia v. Ashcroft*, 293 F.3d
5 | 1155, 1156–57 (9th Cir. 2002).

7 | **IT IS SO ORDERED**.
8 | DATED:  April 28, 2011

*[signature: Larry A. Burns]*

**HONORABLE LARRY ALAN BURNS**
United States District Judge